IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 14, 2026

**STATE OF TENNESSEE v. SHAY TYLER LITTLE**

**Appeal from the Circuit Court for Montgomery County**
**No. 63CC1-2023-CR-895  Robert Bateman, Judge**

_____

**No. M2025-00620-CCA-R3-CD**
_____

The Defendant, Shay Tyler Little, appeals his Montgomery County Circuit Court conviction of aggravated burglary, for which he received a suspended sentence of six years' supervised probation.  On appeal, the Defendant challenges the sufficiency of the convicting evidence.  Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

STEVEN W. SWORD, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TOM GREENHOLTZ, JJ., joined.

Raven Prean-Morris, Assistant Public Defender – Appellate Division, Tennessee District Public Defenders Conference (on appeal); Roger Nell, District Public Defender; and Joseph Price, Assistant District Public Defender (at trial), for the appellant, Shay Tyler Little.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Robert J. Nash, District Attorney General; and Demetrius Daniels-Hill and Marianne L. Bell, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.     FACTUAL AND PROCEDURAL HISTORY**

On September 5, 2023, a Montgomery County grand jury returned an indictment charging the Defendant with one count of aggravated burglary arising from events

occurring on December 25, 2022.  The Defendant's case proceeded to trial on October 30, 2024.

Ben Weakley testified that his daughter, Diana Weakley,[1] lived with him and his wife at their Clarksville home until 2017.  Mr. Weakley testified that the Defendant, whom he described as Diana's boyfriend, also lived in the basement of his home for a short period of time until 2017.  Mr. Weakley recalled that after Diana and the Defendant moved out of his and Mrs. Weakley's home, they lived together in "an assortment of locations," including the Defendant's father's home.

Mr. Weakley testified that Diana had three children and that the Defendant was the father of her middle child.  Mr. Weakley recalled that he and Mrs. Weakley began sharing "temporary-emergency custody" of these children in August 2021 when Diana sought rehabilitative treatment for "substance abuse" issues.  He described the "temporary-emergency custody" court order as permitting Diana to visit her children at his and Mrs. Weakley's discretion; however, the order forbade the Defendant from visiting or contacting his son.

Mr. Weakley testified that he, Mrs. Weakley, and their three grandchildren visited his sister's home on the evening of December 25, 2022, for an "after-Christmas" party.  He stated that his sister's home was "two doors down" from his home.  He recalled that he and his family went to his sister's home around 5:00 p.m. and that he locked his home's doors before he left.  Mr. Weakley remained at the party until approximately 9:00 p.m., at which time he felt tired from the day's Christmas festivities and walked home alone.

Mr. Weakley recalled that he entered his home through a side door near his kitchen. He described this door as the door he and his family typically used to enter and exit the home.  He described the main floor of his home as having a kitchen, an "open" living room, and two bedrooms near the opposite end of the home, one of which he called the master bedroom.  The living room separated the kitchen from the bedrooms, but Mr. Weakley averred that one standing in the kitchen would have a clear view into the master bedroom.

Mr. Weakley stated that soon after he returned to his home, he sat in a "little sitting area" in his kitchen and turned on his television.  Shortly after sitting down to watch television, Mr. Weakley heard a "thumping" coming from the other end of his home.  Mr. Weakley looked through the living room and saw that his bedroom door was slightly open. Shortly thereafter, he saw a light flashing through the open door and heard a "little more thumping."  He believed the flashing light was from someone using a flashlight to search

---

[1] Because Diana Weakley shares the same surname as Mr. and Mrs. Weakley, we will hereafter refer to her by her first name.  We intend no disrespect.

- 2 -

around the bedroom. He also noted that his pet dog, who was usually "aggravated" when someone came to deliver mail, was unusually quiet and in the kitchen with him when he heard the thumping noises.

Mr. Weakley walked slowly towards his bedroom door. As he approached, he heard more thumping noises from within the bedroom. In an effort to "move [the intruder] out of there," Mr. Weakley slammed the bedroom door and "hollered." In the three or four seconds afterward, he heard more "clambering," "shifting," and "bumping" noises. When he opened the bedroom door and turned on the lights to investigate, he found it empty, with the window open. Mr. Weakley walked to the open window, yelled for the intruder to leave, then closed it. He was unsure whether he locked the window after closing it.

Mr. Weakley testified that if his bedroom door had been open when he arrived home, he would have been able to see it was open from where he stood in the kitchen. He stated that the window was not open when he and his family left to visit his sister's home. He further stated that Mrs. Weakley did not open the bedroom windows during the day, but she occasionally opened them in the evenings while the family slept to cool the rooms. He averred that Mrs. Weakley "[p]robably" left the windows unlocked when she opened and closed them for air. He also noted that there was an air conditioning system directly underneath the window. He described the window as five feet above the ground and the air conditioning system as three feet above the ground.

Mr. Weakley recalled that several items within the bedroom were disturbed; a lamp was knocked over, and books on the nightstand were "disheveled." He found an open "lock-blade knife" on the bedroom floor near his closet door. Mr. Weakley did not recognize the knife and took a photograph of it. He also noted that the bedroom was smoky. He testified that neither he nor Mrs. Weakley smoked cigarettes and did not permit smoking in their home; however, he knew that the Defendant smoked. He further recalled that the bedroom window had a screen, which was in place when he left to visit his sister's home, but which he found was removed when he returned home.

Mr. Weakley noted that his bedroom had two closets; Mrs. Weakley used the larger "walk-in" closet, and he used the smaller closet, which he described as being two or three feet long. He testified that he kept his clothes, shoes, and a small lockbox inside his closet. Mr. Weakley stated that he stored important documents and cash within the lockbox. He testified that a key was required to open the lockbox and that he kept it in a small basket on the middle shelf of his closet.

Mr. Weakley denied that he had previously told the Defendant about the lockbox and where he kept its key. However, he recalled that he and Mrs. Weakley had noticed "potential missing money" in the months preceding the offense. To "relieve" their

suspicions, Mr. Weakley installed security cameras around the home, including one in the closet, angled to look down on the area where he kept the lockbox. He stated that the security cameras activated when they detected motion. Approximately one month before the offense, the closet's security camera recorded Diana removing money from the lockbox. He and Mrs. Weakley removed most of their money from the lockbox and began distributing it elsewhere in their home; however, they left a small amount of cash in the lockbox as "a little bait money." He testified that he had an insignificant amount of cash in the lockbox on the night of the offense. He estimated that he also kept a few hundred dollars in his nearby dresser for "babysitting money," along with a few smaller denominations for Sunday school. He stated that an individual entering the bedroom would be able to walk straight forward to his closet.

Several video recordings, taken from Mr. Weakley's home security cameras, were played for the jury. Mr. Weakley identified the first recording as being from a security camera angled to view his front porch. The first recording depicted a person wearing dark clothing walking on Mr. Weakley's porch, going around a rocking chair, and attempting to open the door. When the person was unable to open the door, the person began searching under items on the front porch before walking out of the camera's view. Mr. Weakley testified that he did not recognize the person shown in the recording because of the person's clothing.

Mr. Weakley identified the second recording as being taken from a security camera angled to view the side entrance to his home. He testified that this was the side entrance through which he entered his home after leaving his sister's home. This recording also depicted a person wearing dark clothing approaching the side entrance. The person attempted to open the door and, after finding it locked, walked away. The person wore a dark-colored coat, its hood pulled over their head.

Mr. Weakley identified the third recording as being taken from a security camera angled to view his home's back door and garage area. This recording also depicted a person wearing dark clothing approaching the back door. The person attempted to open the door and, after finding it locked, walked away.

The State also introduced three video recordings taken from the closet security camera through Mr. Weakley's testimony. Mr. Weakley testified that this camera would activate for a few seconds when it detected motion. He was unsure how long the camera remained active and recording the motion, but averred that it typically stopped recording a few seconds after the motion ended.

The first closet recording video showed a person wearing a dark hooded coat, shining a cell phone flashlight into the closet, and rummaging through a shelf before

stepping out. The second closet recording depicted the person attempting to activate a cell phone flashlight. Mr. Weakley also testified that the person appeared to be wearing gloves that left the person's fingers exposed. After activating the cell phone flashlight, the person grabbed a key from the shelf and rummaged around near the bottom of the closet. The third closet recording depicted the person, now with the coat's hood down, rummaging inside the closet. From the third closet recording, Mr. Weakley identified the person inside the closet as the Defendant based upon his visible "dark hair," "forehead, cheeks[,] and nose." He described the Defendant as having "long, straight-black hair" styled in "bangs" "straight down on his forehead." Mr. Weakley testified that the Defendant always wore his hair in this style. He further described the Defendant as being between five feet and five inches to five feet and six inches tall.

Mr. Weakley testified that he did not give the Defendant or Diana permission to enter his home on the evening of the offense. He also testified that the Defendant was unable to enter the lockbox. Mr. Weakley believed that some of his "babysitting money" had been stolen and noted that one of his grandchildren had found a fifty-dollar bill under the bedroom window shortly after the offense. Mr. Weakley identified the Defendant in court.

On cross-examination, Mr. Weakley testified that he was unsure how many intruders were present in his home when he first approached the bedroom door. He stated that the family's pet dog had also lived with them while the Defendant and Diana lived with them. He testified that the dog reacted "fine" towards both the Defendant and Diana. He believed that Diana and the Defendant lived with the Defendant's father nearby at the time of the offense.

Mr. Weakley stated that he informed law enforcement that Diana had previously stolen from him on multiple occasions. He testified that he initially suspected Diana or the Defendant of being the intruder; however, he averred that he did not suspect Diana after reviewing the closet security camera footage. He explained that he believed the security recordings depicted a male, although he agreed that it was difficult to "recognize a person" in the footage from the cameras near the entrances to his home. Mr. Weakley testified that he believed the person depicted in the closet recordings was the Defendant based upon the percentage of the Defendant's face shown in the recordings, although he averred he could not definitively testify to that effect "without seeing the entire face."

Mr. Weakley agreed that Brockman Woods, the father of Diana's youngest child, occasionally visited the child at his home. However, Mr. Weakley testified that either he or Mrs. Weakley was also present during these visits and that Mr. Woods was never permitted to visit the bedroom where the offense occurred. He was unsure whether Diana told Mr. Woods about the lockbox or its location within the home.

Diana Weakley testified that she had three children and that the Defendant was the father of her middle child. She stated that she and the Defendant began dating in 2014 and had lived together "on and off" at the Defendant's father's home and at his mother's home. She stated that her three children lived with Mr. and Mrs. Weakley, their grandparents.

Diana testified that during December 2022, she and the Defendant lived at the Defendant's father's home. During this time, the Defendant worked as an Uber Eats delivery driver. Diana stated that in this line of work, the Defendant typically received a notification to collect an order from a restaurant or business on his cell phone, collected the order, and delivered it to the customer. She testified that the Defendant used her vehicle to complete deliveries and that she accompanied him "[e]very time."

Diana recalled that she and the Defendant were supposed to see their son on December 25, 2022, but that Mr. and Mrs. Weakley "revoked that privilege for both of [them] due to [Diana's] being around" the Defendant. Diana stated that the Defendant blamed her for their not being permitted to visit their son and described him as "irate" and "very belligerent" on the night of the offense. She recalled that the Defendant informed her later that evening that he had received an Uber Eats order from Walgreens. Diana drove herself and the Defendant to Walgreens; however, during the drive, the Defendant informed her that the order "just went away." The Defendant instructed Diana to turn the vehicle around and drive to his father's home. Diana did so, and the couple entered the home. She testified that the Defendant collected three heavy jackets and a "fuzzy" hat from his father's home and then returned to Diana's vehicle. The Defendant explained that he was going to wear these clothes to "make himself look a little bit bigger."

Diana conceded that she had a "drug addiction" at the time of the offense and that her "drug of choice" was fentanyl. She recalled that on the evening of the offense, the Defendant told her she could get more fentanyl if she drove him to her parents' home. Diana agreed, and the Defendant instructed her to park the vehicle in a driveway diagonal to her parents' home. Once there, the Defendant told Diana to wait in her vehicle and to set a five-minute timer on her cell phone. He stated that if he did not return within five minutes, Diana should "turn the car around."

Diana testified that the Defendant exited the vehicle and walked towards Mr. and Mrs. Weakley's home. She recalled that he wore all three of the heavy jackets and a hat. She was unsure whether he wore a mask. She stated that she did not "turn the car around" after five minutes' time. She estimated that the Defendant returned to the vehicle twenty minutes after he exited it. She described him as "freaking out" and recalled that he told her to "hurry up and turn the car around and get out of the area as fast as [she] could." The Defendant later explained that he had entered Mr. and Mrs. Weakley's bedroom and

attempted to "grab all the money from" the lockbox. The Defendant heard "someone in the house" and, frightened, he jumped out of the bedroom window. Diana stated that the Defendant landed on the air conditioning unit and sustained several bruises and scrapes around his ribs. She recalled that the Defendant later realized that he had dropped his pocketknife in Mr. and Mrs. Weakley's bedroom.

Diana stated that after they drove away from her parents' home, the Defendant attempted to find a place to hide the clothing he wore during the offense. She was unsure where the Defendant attempted to hide the clothing. She testified that the Defendant did not retrieve any money from her parents' home.

Diana testified that approximately one month prior to the offense, she stole cash from Mr. Weakley's lockbox. She stated that she and the Defendant used the funds to purchase drugs and for a trip to Gatlinburg. She agreed that she told the Defendant from where she procured these funds and where Mr. Weakley's lockbox was located. She stated that the Defendant would have known how to enter her parents' home from his previous visits. Diana denied asking the Defendant to enter her parents' home and attempt to steal from them on the night of the offense.

Diana recalled that the Defendant was arrested in February 2023. She later spoke with law enforcement officers and agreed that "the story that was given previously was baloney." She also provided a written statement to law enforcement. She denied that she and the Defendant visited Walgreens on the night of the offense. Diana identified the Defendant in court. She also described the Defendant as a heavy cigarette smoker.

On cross-examination, Diana testified that she was unsure how much money she stole from Mr. Weakley's lockbox prior to the offense. She stated that she did not take all the money it contained. She agreed that she had not been criminally charged in relation to that incident. She testified that the Defendant was the only person she had told about the lockbox and its location. She also agreed that she lied to Mr. Weakley regarding how she used the money she stole.

Diana recalled that on June 27, 2023, she gave a written statement to law enforcement. She stated that, by that time, she and the Defendant had ended their relationship, and she then felt safe to "finally come open with the truth." Diana initially agreed that she had not contacted the Defendant since they broke up; however, she later conceded that she wrote the Defendant a letter in August 2024. She stated that she was a patient at a drug rehabilitation facility at that time and was "detoxing" and hallucinating from her use of methamphetamine. She averred that she had not initially recalled writing the August 2024 letter to the Defendant because she had been suffering from hallucinations when she wrote it.

- 7 -

Diana testified that she had brown hair, which she "always" wore "straight with a part on the side." She stated that she did not frequently change her hairstyle; however, she later agreed that she changed her hairstyle "periodically." She was unsure whether her hair was short or long at the time of the offense or how she styled it. The Defendant introduced several photographs of Diana through her testimony. Diana agreed that each of these photographs depicted her, although she averred that several were "from years ago." She agreed that the photographs showed her hair in different styles, including one in which she wore it short with bangs.

Diana conceded that she and the Defendant occasionally used fentanyl and methamphetamine around the time of the offense. However, she testified that she did not hallucinate on December 25, 2022. She also conceded that she was under the influence of drugs when she initially spoke to law enforcement after the Defendant's arrest; however, she denied that this caused her to omit or embellish certain facts in her statement. She stated that she approached law enforcement six months after the Defendant's arrest, after Mr. Weakley and an investigator contacted her and asked her to provide a statement about the offense. She stated that she did not inform law enforcement that the Defendant had sustained bruises during the offense because she was not asked.

On redirect examination, Diana testified that she was five feet two inches tall. She also stated that at the time of the offense, she occasionally smoked methamphetamine, but that she predominantly snorted fentanyl. She averred that by the summer of 2024, she was injecting herself with methamphetamine intravenously and that this drug use caused her to suffer hallucinations. She testified that, at the time of trial, she had been sober since August 2024 and that she was not presently under the influence of any drugs. On recross-examination, she conceded that she did not remember whether she wore her hair in bangs at the time of the offense.

Montgomery County Sheriff's Office (MCSO) Deputy Dylan Ragsdale testified that he responded to a report of a burglary at approximately 9:08 p.m. on December 25, 2022. Deputy Ragsdale testified that when he arrived at the Weakleys' home, he briefly spoke with Mr. Weakley and then entered the residence and ensured the intruder was no longer present. Afterward, Deputy Ragsdale entered the master bedroom, where he saw that several items appeared to have been moved on a nightstand near the bed and that a lamp had been "laid over up against the bed." He also found an open pocketknife lying on the bedroom floor and photographed it.

Deputy Ragsdale testified that he later reviewed the recordings taken from Mr. Weakley's security cameras. Although he did not recall the details of the recordings taken from the outside of Mr. Weakley's home, he recalled that the closet security camera

recordings depicted an individual who "went straight for the area [where] Mr. Weakley explained to deputies that he keeps the keys for the lockbox." The individual then attempted to unlock the lockbox.

Deputy Ragsdale further recalled that he noticed the bedroom window's screen had been removed and was sitting atop the air conditioning unit. He noted that there was approximately one and a half inches of snow on the ground and that footprints were visible on the top of the air conditioning unit and the surrounding area. Deputy Ragsdale testified that he and his supervisor followed the footprints into the edge of the nearby woods and highway. As they followed the footprints, they approached a driveway leading to a home under construction. Deputy Ragsdale averred that there were no tire marks on the driveway, but he "could see where a vehicle had been sitting" at the entrance to the driveway. He stated that the footprints ended at the driveway entrance. He stated that a person in a vehicle parked in the driveway would have been able to see the lights from Mr. and Mrs. Weakley's home.

On cross-examination, Deputy Ragsdale testified that Mr. Weakley was the only person present at his home when he arrived and during the investigation. He averred that the snow on and around the air conditioning unit did not appear as though anyone had fallen nearby.

MCSO Investigator Paul Carman testified that he investigated the burglary at Mr. Weakley's home. He recalled that he was initially assigned to the case on December 27, 2022, and thereafter contacted Mr. Weakley to arrange a visit to the home. There, he reviewed the security camera recordings and other evidence with Mr. Weakley. During their meeting, Mr. Weakley informed Investigator Carman that he believed the Defendant was involved in the burglary. Mr. Weakley provided Investigator Carman with the Defendant's father's address and a description of Diana's vehicle.

Investigator Carman testified that upon arriving at the Defendant's father's home, he saw a vehicle which matched the description Mr. Weakley had provided of Diana's vehicle; after checking the vehicle's license plate, he confirmed that it was registered in Diana's name. Investigator Carman approached the Defendant's father's home, and the Defendant agreed to speak with him. During this interview, the Defendant told Investigator Carman that he completed an Uber Eats delivery from Walgreens around 7:00 p.m. on December 25, 2022. After completing the delivery, the Defendant remained at the customer's home, where he "stayed a little while and partied and drank a few beers." The Defendant later showed Investigator Carman the Uber Eats application on his cell phone, which Investigator Carman testified showed that the Defendant was "[s]tationary [at] the Walgreens on Madison Street for three-and-a-half hours." He recalled that the Defendant showed him several other completed deliveries, each of which included a "path of travel

- 9 -

for the order"; however, the December 25, 2022 delivery "just showed a singular dot in the parking lot for the entirety" of the delivery.

Investigator Carman testified that he thereafter went to the Walgreens on Madison Street to review its surveillance video recording footage from the night of the offense. He recalled reviewing surveillance footage from a camera installed facing the store entrance, and that neither the Defendant nor Diana entered the store between 6:00 p.m. and 11:00 p.m.

Investigator Carman stated that he interviewed the Defendant again on December 28, 2022. He stated that the Defendant's statement was largely consistent with his recollection of the previous day and that the Defendant maintained he and Diana had entered the Walgreens on the night of the offense. The Defendant also stated that Diana and her parents were not "on the best of terms." He described the Defendant as being "disappointed and upset" that he had been unable to visit his son on December 25, 2022.

Investigator Carman testified that after interviewing the Defendant and reviewing the evidence, he obtained a warrant for the Defendant's arrest on January 9, 2023. He testified that the Defendant was five feet nine inches tall and had brown hair. A copy of the Defendant's booking photograph showing the Defendant with straight dark-colored hair covering his forehead was introduced as an exhibit. Investigator Carman testified that the booking photograph depicted the Defendant with the same haircut as he had when Investigator Carmen interviewed him on December 27 and 28, 2022. Investigator Carman identified the Defendant in court.

Investigator Carman testified that Mr. Weakley's lockbox and the pocketknife found on the bedroom floor were collected into evidence by investigating officers. Investigator Carman recalled he sent these items to the Tennessee Bureau of Investigation "to have them tested for residual DNA." He stated that the test results were inconclusive.

On cross-examination, Investigator Carman testified that he did not obtain a copy of the Walgreens surveillance video because neither he nor the manager was certain how to make one. He recalled telling the Defendant that he was unsure if the individual depicted in the home security camera videos was the Defendant and noted that "the hair might have been a little longer." He also stated that he did not see any bruising or injuries to the Defendant's body when the Defendant was arrested; however, he noted that the Defendant was fully clothed and stated that the Defendant had COVID-19 at the time of his arrest, so Investigator Carman "stayed a little away" from him.

The State rested. Following a *Momon* colloquy, the Defendant elected not to testify and did not present additional proof. Upon this evidence, the jury convicted the Defendant

- 10 -

as charged.  Following a sentencing hearing, the trial court imposed a sentence of six years' incarceration, suspended to supervised probation.  The Defendant filed a timely, but unsuccessful, motion for a new trial.  This timely appeal followed.

## II.   ANALYSIS

On appeal, the Defendant challenges the sufficiency of the convicting evidence, arguing that there is insufficient proof of his identity as the intruder.  The State responds that the evidence is sufficient.  We agree with the State.

"Findings of guilt in criminal actions . . . shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e).  The standard of appellate review on a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citations omitted); *see also State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient."  *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *see also State v. Thomas*, 687 S.W.3d 223, 249 (Tenn. 2024) (citing *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000)).  "On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom."  *State v. Wilson*, 211 S.W.3d 714, 718 (Tenn. 2007) (citing *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999)).  "We do not reweigh the evidence . . . because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury as the trier of fact."  *State v. Curry*, 705 S.W.3d 176, 183 (Tenn. 2025) (citations omitted).  The same standard of review applies "whether the conviction is predicated on direct or circumstantial evidence, or a combination of both."  *Williams*, 558 S.W.3d at 638 (first citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); and then citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977)).

"[T]he identity of the perpetrator is an essential element of any crime," *State v. Miller*, 638 S.W.3d 136, 158 (Tenn. 2021) (citations omitted), which the State must prove beyond a reasonable doubt, *State v. Hardison*, 680 S.W.3d 282, 319 (Tenn. Crim. App. 2023) (citations omitted).  "Identification of a defendant as the person who committed the offense for which he or she is on trial is a question of fact for the jury's determination upon consideration of all competent proof." *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005), *abrogated on other grounds by Miller*, 638 S.W.3d 136.  Identity may be established by

circumstantial evidence alone. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006), *abrogated on other grounds by Miller*, 638 S.W.3d 136. "The jury decides the weight to be given to circumstantial evidence, and the inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *Rice*, 184 S.W.3d at 662 (internal quotation marks and citation omitted). "As with any sufficiency analysis, the State is entitled to the strongest legitimate view of the evidence concerning identity contained in the record, as well as all reasonable inferences which may be drawn from the evidence." *Hardison*, 680 S.W.3d at 319.

The Defendant was charged and convicted of one count of aggravated burglary. As relevant to this appeal, a person commits aggravated burglary "who, without the effective consent of the property owner" and "with the intent to commit a felony, theft, or assault," enters a habitation. Tenn. Code Ann. §§ 39-13-1002(a)(1), -1003(a).

The Defendant asserts that the evidence adduced at trial, even when viewed in the light most favorable to the State, is insufficient to prove his identity. In support of this argument, he advances numerous attacks on Diana's credibility: he asserts that her testimony was impeached; that she was under the influence of drugs during the offense; that she "struggled to recall important details" regarding the offense; that she evaded defense counsel's questions; that defense counsel showed her reputation for untruthfulness through her admitted lies; that she was biased against the Defendant; that she was an accomplice who was influenced by her lack of criminal charges; that she had motive to lie, either to evade prosecution or return to Mr. Weakley's "good graces"; and that her testimony was unreasonable. He also contends that no other evidence established the Defendant's identity.

The Defendant cites to the Tennessee Pattern Jury Instructions on witness credibility and impeachment of witnesses in support of his argument. These instructions matched those provided to the jury. After providing considerations for witness credibility, the trial court instructed the jury, in relevant part:

> However, you may conclude that a witness deliberately lied about something that is important to how you decide the case. If so, you may choose not to accept anything that witness said. On the other hand, if you think the witness lied about some things but told the truth about others, you may simply accept the part you think is true and ignore the rest.

*See* T.P.I.–Crim. 42.04(a) (28th ed. 2024). The trial court also instructed the jury that it was the exclusive judge of a witness's credibility and the weight of the evidence. *Id*. As relevant to the impeachment of witnesses, the trial court instructed the jury, in relevant

part, "[w]hen a witness is thus impeached, the jury has the right to disregard his or her evidence, and treat it as untrue, except where it is corroborated by other credible testimony, or by the facts and circumstances proved on the trial." *See id.* 42.06.

The Defendant's challenge is, at its core, a challenge to the jury's determination that Diana was a credible witness and the weight it accorded her testimony. To be sure, the Defendant thoroughly assailed Diana's testimony and credibility during cross-examination and impeachment. Nevertheless, the jury was instructed as to how to deal with questions of witness credibility and impeachment and, importantly, was informed that it was the sole adjudicator of the weight of the evidence. The jury is presumed to follow the trial court's instructions. *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006). After hearing the Defendant's litany of challenges to Diana's credibility, the jury weighed her testimony and the remaining evidence presented at trial and, by its verdict, found her credible. It is not the province of this court to reweigh the evidence or to substitute our credibility determinations for those of the jury. *Curry*, 705 S.W.3d at 183. Indeed, we have repeatedly affirmed convictions when faced with similar credibility-based challenges. *See, e.g.*, *State v. Schmaltz*, No. E2024-01107-CCA-R3-CD, 2025 WL 3023056, at *9 (Tenn. Crim. App. Oct. 29, 2025) (rejecting a defendant's argument that the evidence was insufficient where the defendant impeached the victim's testimony and argued that her "account of events varied"), *perm. app. denied* (Tenn. Mar. 30, 2026); *State v. Zapata*, No. W2023-00111-CCA-R3-CD, 2023 WL 8628832, at *6 (Tenn. Crim. App. Dec. 13, 2023) (rejecting a defendant's argument that the evidence was insufficient where the defendant argued that the victim and other witnesses were not credible because they could not remember certain details about the case), *perm. app. denied* (Tenn. May 16, 2024); *State v. Oakes*, No. E2010-00636-CCA-R3-CD, 2011 WL 1630669, at *3 (Tenn. Crim. App. Apr. 26, 2011) (rejecting a defendant's argument that the evidence was insufficient because an identifying witness testified that he was intoxicated at the time of the offense but that this intoxication did not impact his ability to understand or recall events), *perm. app. denied* (Tenn. July 15, 2011).

The Defendant also argues, among his challenges to Diana's credibility, that she was an accomplice and that her testimony was uncorroborated. He further characterizes her testimony as "biased and self-serving." The common law accomplice-corroboration rule provided that "evidence is insufficient to sustain a conviction when the conviction is solely based upon the uncorroborated testimony of one or more accomplices." *Thomas*, 687 S.W.3d at 239 (quoting *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013)) (internal quotation marks omitted). In *Thomas*, the Tennessee Supreme Court abolished the common law accomplice-corroboration rule in favor of the following cautionary jury instruction:

> The prosecution has presented a witness who claims to have been a participant with the defendant in the crime charged. While you may convict upon this testimony alone, you should act upon it with great caution. Give it careful examination in the light of other evidence in this case. You are not to convict upon this testimony alone unless you are convinced beyond a reasonable doubt that it is true.

*Thomas*, 687 S.W.3d at 248; *see also* T.P.I.–Crim. 42.09 (28th ed. 2024). The Tennessee Supreme Court noted that this new rule applied prospectively to "all trials commencing after the date of [*Thomas*'s] mandate," which was March 18, 2024. *Thomas*, 687 S.W.3d at 245; *see also State v. Slater*, No. M2024-01280-CCA-R9-CO, 2025 WL 688920, at *5 (Tenn. Crim. App. Mar. 3, 2025) (holding that *Thomas*'s abrogated accomplice-corroboration rule applied to a defendant who had been indicted before March 18, 2024, but whose trial commenced thereafter), *no perm. app. filed*; *State v. Hughes*, No. M2023-00732-CCA-R3-CD, 2024 WL 22390312, at *12 (Tenn. Crim. App. May 17, 2024) (holding that the common law accomplice-corroboration rule applied to a defendant whose trial commenced and concluded before March 18, 2024, but whose appeal was pending at the time *Thomas* was determined), *perm. app. denied* (Tenn. Oct. 25, 2024).

The Defendant's trial commenced in this case on October 30, 2024, after the date of *Thomas*'s March 18, 2024 mandate. The trial court appropriately determined that Diana was an accomplice to the charged offense and included an accomplice instruction in accordance with *Thomas* in its final jury charge. *See Thomas*, 687 S.W.3d at 248; T.P.I.–Crim. 42.09 (28th ed. 2024). No corroborative proof was required to support Diana's testimony, and the jury, after being charged to carefully consider Diana's testimony and not to convict the Defendant upon her testimony alone unless the jury was convinced beyond a reasonable doubt that her testimony was truthful, accredited Diana's testimony, as was its prerogative. *Curry*, 705 S.W.3d at 183. We may not disturb that credibility determination. *Id*.

Moreover, the evidence, when viewed in the light most favorable to the State, supports the jury's verdict. The record reflects that the jury was presented with ample evidence from which to conclude that the Defendant was the person who entered the home, and did so with the intent to commit theft. Diana testified that on December 25, 2022, the Defendant told her he could obtain more fentanyl for her if she drove him to her parents' home. Diana testified that she did so, that the Defendant walked towards the home, and that he returned approximately twenty minutes later, "freaking out." She further testified that the Defendant told her he had entered her parents' bedroom and attempted to "grab all the money" from the lockbox. When he heard "someone in the house," the Defendant became frightened and exited the bedroom by jumping out the bedroom window, landing on the air conditioning unit. Mr. Weakley testified that no one in his house smoked

cigarettes but that his bedroom smelled of cigarettes when he entered it on the night of the offense; he stated that he knew the Defendant smoked, and Diana described the Defendant as a heavy cigarette smoker. Mr. Weakley also testified that the Defendant did not have his permission to enter his home. He also testified that his dog, who was usually "aggravated" when someone approached the home but generally behaved "fine" towards Diana and the Defendant, was unusually quiet that evening. Mr. Weakley and Diana each identified the Defendant in open court. The jury was also presented with several photographs of Diana in various hairstyles, as well as a copy of the Defendant's booking photograph for comparison with the recordings. Six security camera recordings depicting the intruder were shown to the jury, and upon its consideration of the evidence and the Defendant's arguments to the contrary, the jury concluded that the Defendant was the individual depicted therein. The Defendant is not entitled to relief.

## III. CONCLUSION

Following our review of the record and based upon the foregoing analysis, we affirm the judgment of the trial court.

s/ *Steven W. Sword*
STEVEN W. SWORD, JUDGE